**Willie MARTIN and Mrs. Alma Martin, Plaintiffs-Appellees-Cross Appellants,**

v.

**The TRAVELERS INDEMNITY COMPANY, Defendant-Appellant-Cross Appellee,**

**Charles Kinnard, Intervenor-Appellee-Cross Appellant.**

No. 30483.

United States Court of Appeals, Fifth Circuit.

Nov. 3, 1971.

W. Scott Welch, III, Lawrence J. Franck, Roger C. Landrum, Jackson, Miss., for appellant and cross-appellee; Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., of counsel.

Francis S. Bowling, Jackson, Miss., William W. Ferguson, Raymond, Miss., William F. Coleman, Jackson, Miss., for appellees-appellants; Bowling, Coleman & Cothren, Jackson, Miss., of counsel.

Before TUTTLE, WISDOM, and INGRAHAM, Circuit Judges.

WISDOM, Circuit Judge:

This diversity appeal requires us to decide two intricate and interrelated questions of insurance law—as we think the highest court of Mississippi would decide them. In addition, the parties have locked horns over a number of subsidiary issues relating to the procedure followed in the court below.

Charles Kinnard Brown, known throughout these proceedings as Charles Kinnard (or simply "Kinnard"), worked for a number of years at a service station near Utica, Mississippi, owned by Hubbard Butane Company. Hubbard Butane was, in turn, owned by Charles Hubbard; the service station and Hubbard Butane itself were run by Charles Hubbard and his son-in-law, Richard Partridge. Hubbard Butane allowed Kinnard to use company vehicles for the purpose of travelling to and from his place of employment to his home. There was evidence, not seriously controverted, that Hubbard and Partridge had instructed Kinnard and other employees given similar privileges that they were not to use company vehicles for any purpose other than travelling to and from work.

The record shows that on the evening of June 16, 1967, a Friday, at about 6:00 p. m., Partridge reminded Kinnard as he was leaving work in a company station wagon to use that vehicle only to travel home and not for any other purpose. Kinnard, however, drove instead to a girl friend's home in Hickstown, a nearby community. Kinnard spent the night in Hickstown, and the following morning, Saturday, June 17, 1967, while en route to his home, Kinnard was in an automobile accident with Willie Martin and Mrs. Alma Martin. Both the Martins sustained serious injuries in the crash. Mr. and Mrs. Martin sued Kinnard in the Mississippi state court, and received judgments in their favor for $100,000 and $75,000 respectively. The Mississippi Supreme Court affirmed these judgments.

Prior to June 17, 1967, The Travelers Indemnity Company ("Travelers") had issued to Hubbard Butane Company a comprehensive general liability policy, including automobile liability insurance, which was in effect on the day of Kinnard's accident. This policy provided limits of $50,000 for a single claim and $100,000 for multiple claims. It was a standard policy containing an "omnibus clause," providing that in addition to the named insured the policy also insured "any other person while using an automobile * * * with the permission of the insured provided his actual operation thereof is within the scope of such permission. * * * *" The policy also contained the standard provision requiring that any insured cooperate with the insurer.

Travelers hired an attorney to represent Kinnard in the state court proceedings, but it did so under a non-waiver agreement reserving the insurer's right to deny that Kinnard was covered by the omnibus clause of the Hubbard policy. When the Martins, as judgment creditors, filed suit in the United States District Court for the Southern District of Mississippi demanding payment of the state court judgments by Travelers under the Hubbard liability insurance policy, Travelers did deny that Kinnard was its insured. After all the evidence was in, the district court turned down Travelers' motion for a directed verdict and allowed the jury to decide whether, under the applicable Mississippi law, Kinnard was Travelers' insured. The jury returned a verdict favorable to the Martins, finding coverage, and Travelers moved for

judgment n. o. v. That motion was denied, and on this appeal Travelers now asks us to rule that the jury verdict should not have been allowed to stand, since there was insufficient evidence to support it.

### I. *Kinnard's Coverage.*

A. We turn to the central issue in the case: Did the district court err in allowing the jury to decide whether Kinnard operated the Hubbard vehicle "within the scope of the permission" granted him by Hubbard? If the issue was properly submitted to the jury, then its finding that Kinnard may claim the protection of Hubbard's automobile insurance must stand. If, however, the trial judge erred in allowing the jury to determine the scope of Hubbard's permission to Kinnard, then Travelers' appeal must be sustained and Kinnard must satisfy the state court judgment against him as best he can.

In this Circuit, at least, it is proper to grant motions for a directed verdict and for judgment notwithstanding the verdict only "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374. In *Boeing* we noted that "it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." 411 F.2d at 375.

With this federal rule of judge and jury in the background, our role in this diversity appeal is a limited one. We must ascertain as best we can the present law of Mississippi, and then decide whether that law was applied correctly below. Mindful of that role, we affirm the submission to the jury of the issue of Kinnard's coverage under the Travelers policy.

Only three years ago, the Supreme Court of Mississippi considered at some length the test it would apply to determine whether an automobile was driven within the scope of the permission of the named insured, so as to entitle the driver to claim the protection of the "omnibus" clause of the named insured's policy. Travelers Indemnity Company v. Watkins, 209 So.2d 630 (1968). The court rejected "strict" construction of the omnibus clause, requiring affirmative proof that the use at the time when the claim arose was specifically within the scope of the named insured's permission. At the same time the court refused to adopt the "liberal" approach under which the original loan by the owner is held to permit all uses by the borrowing driver. Instead, the Mississippi Supreme Court embraced the intermediate or "minor deviation" rule, which provides protection for the borrowing driver unless his operation of the vehicle at the time and place of the accident is either specifically prohibited [1] or amounts to a gross deviation from the time, place, and nature of use expressed in the owner's permission.

Our first inquiry, then, is whether reasonable men might have decided that Kinnard was not specifically prohibited from operating the Hubbard vehicle as

---

1. The court, quoting from 7 Am.Jur.2d Automobile Insurance § 112 (1963), described a permitted act as "one not specifically prohibited as contrasted to an act affirmatively and specifically authorized." 209 So.2d at 632–633. Apparently, if the act which gives rise to the accident is specifically prohibited, there is no need to decide the degree to which the borrower has deviated from the lender's permission. A possible rationale for this approach, implicit in the *Watkins* opinion, is that any deviation is gross when in violation of a specific prohibition on a particular kind of use. The question remains, of course, as to what constitutes a specific prohibition.

Though the Mississippi Supreme Court did use the phrase "positive, express prohibition" interchangeably with "specific prohibition," for reasons which are stated in this opinion we find "specific prohibition" a more precise formulation of the inquiry and shall continue to apply that formulation for the remainder of this opinion.

he did at the time of the accident. Unfortunately, the *Watkins* decision fails to make clear exactly what the Mississippi Supreme Court meant by "specifically prohibited." In order to evaluate Travelers' contention, we must therefore determine the meaning of "specifically prohibited" from the facts of the *Watkins* case itself.

In *Watkins,* an employee was granted use of his employer's truck for a personal errand on Saturday afternoon. When the employee asked his supervisor if he should return the truck to the employer when he had completed his personal business, the supervisor replied, "No, leave it at home, leave it in the yard there and bring it back Monday morning." The accident occurred when the employee used the truck to pick up his wife on Sunday at a neighbor's house. On these facts the Mississippi Supreme Court concluded that there was no "positive, express prohibition against using the truck on Sunday." Travelers argues that here, unlike *Watkins,* Kinnard was specifically prohibited from using the borrowed vehicle as he did at the time of the accident. The company points to Hubbard's instructions that Kinnard use the vehicle only for travel to and from work, not for "running all around the countryside." In other words, here the lender did tell Kinnard *not* to use the station wagon except to go to and from work. In Travelers' view, Hubbard's negative imperative converted his instructions to Kinnard into the "positive, express prohibition" found wanting in *Watkins.*

We think not. In *Watkins,* the lender gave the borrower specific instructions to leave the car in his yard over the weekend. The obvious implication of this instruction was the negative command *not* to use the borrowed vehicle during the same span of time—from Friday to Monday morning. We find it difficult to believe that the Mississippi Supreme Court intended to have the *Watkins* case turn on the distinction between ordering the borrower affirmatively to dispose of the borrowed vehicle (by leaving it in the yard) and an alternative phraseology in the negative—for example, "Do not do any thing with the car besides parking it in your yard." When the Mississippi court concluded that "there was no positive, express prohibition against using the truck on Sunday," we think that the court intended to emphasize the failure of the lender to forbid the precise use which led to the accident —"using the truck *on Sunday*"—rather than the lender's failure to phrase his instructions in the negative imperative. We therefore reject Travelers' invitation to distinguish the present case from *Watkins* simply on account of Hubbard's fortuitous order to Kinnard *not* to use the loaned vehicle except for transportation to and from work.

■ ■ Instead, we apply the *Watkins* test for a specific prohibition by assessing the precision of the lender's instructions for use of the borrowed vehicle. Applying that standard to the present set of facts, we conclude a jury might well decide that Hubbard never prohibited Kinnard from taking the vehicle to Hickstown. There was evidence that Kinnard had been told not to go driving all over the country in the company's cars. But whether or not this command reached the degree of specificity required by the *Watkins* case was a question properly for the jury. We conclude, therefore, that the court did not err in allowing the jury to decide, as it did in responding to the first special interrogatory, that there was no "express prohibition against actual use of the Hubbard vehicle by Charles Kinnard at the time and place the collision occurred."

■ B. Having affirmed the jury determination that Kinnard's use of the vehicle was not specifically prohibited, we must next decide whether his use was so gross a deviation from his employer's permission that he was not within the scope of the employer's permission. The two tests are apparently different ways of evaluating the borrower's deviation in light of the precision of the lender's permission. The specific prohibition test focuses upon the breadth of the lender's

mandate; the minor deviation test upon the actual use of the vehicle by the borrower. Like the specificity of a prohibition on use, the seriousness of a borrower's deviation is a question of fact.

■ We cannot say that the district judge erred in allowing the issue of Kinnard's deviation to be presented to the jury. There was evidence that Kinnard had been instructed to use the Hubbard vehicle only to travel between home and work. There was also testimony indicating that the instruction had been repeated shortly before the accident which gave rise to this litigation. But Hubbard's instruction to Kinnard to use the vehicle only for Kinnard's travel to and from work does not dispose of the possibility that some deviations from Hubbard's oral instructions were inevitable, that they were reasonably to be contemplated by the lender,[2] and that they were therefore only minor deviations within the meaning of the Mississippi law. The jury may have thought occasional deviations by Kinnard understandable when the practice of lending the vehicle to him continued over a period of six years. On these facts, a jury might well find that even the most faithful borrower of his employer's vehicle might stray occasionally from the appointed route and that such deviations were only minor in the context of a long-standing permission to use the vehicle.[3]

II. *The Adequacy of Travelers' Representation of Kinnard.*

This case requires us to evaluate the insurer's duty to conduct litigation properly on behalf of its insured. The district court awarded judgment for Travelers, notwithstanding a jury verdict that Travelers had not properly represented Kinnard during settlement negotiations and that Travelers should therefore be liable for the entire amount of any judgments rendered against Kinnard, even in excess of its liability limits under the Hubbard policy. From this judgment the Martins and Kinnard appeal.

A. The facts underlying this cross-appeal are not in serious dispute, although the parties do attach variant interpretations to the events in question. Travelers investigated the accident soon after its occurrence. It learned from Hubbard's general manager of the instructions given Kinnard restricting his use of company vehicles; and Kinnard himself acknowledged the instructions in a statement taken by a Travelers adjuster at Kinnard's hospital bedside. On investigation, it appeared questionable to Travelers that Kinnard was an omnibus insured, operating within the scope of the named insured's permission. The company therefore obtained from Kinnard a non-waiver agreement, under which Travelers expressly reserved its right to contest Kinnard's coverage while nevertheless agreeing to undertake his defense.

Travelers then hired an attorney, independent of its own counsel, to represent Kinnard. Both orally and in writing, Travelers explained to Kinnard that the company had reserved its rights to contest its liability for any part of any judgment which might be rendered

---

2. In *Watkins,* the Mississippi Supreme Court appears to have applied a test of foreseeability in determining whether a deviation was minor or gross. See 209 So.2d at 635:

 * * * [The borrower] did not leave his neighborhood, but used the truck to go to a neighbor's house to get his wife, *a use that could reasonably be contemplated by the lender.* [His] deviation was minor, *a thing to be expected by the lender* * * *.

 The trial court gave no specific instruction to the jury about how it was to interpret the degree of a deviation from the lender's permission. Since the Mississippi Supreme Court gave no firm indication that it was adopting a foreseeability test for degree of deviation, we see no error in the trial court's ·decision not to amplify this test. It was entirely consistent with the *Watkins* decision to allow the jury to attach its own interpretation to the terms "minor deviation" and "gross deviation."

3. Since we hold that there was no error in allowing the jury to decide that Kinnard's use did not constitute a gross deviation from Hubbard's permission, we need not decide whether through implied permission (or ratification) Hubbard had authorized the use by Kinnard which led to the accident.

against Kinnard. Travelers also made it clear that Kinnard's interests and those of Travelers might conflict and that Kinnard might hire his own lawyer if he wished.

In time, Mississippi state court judgments were rendered against Kinnard in favor of Mr. and Mrs. Martin, for $100,000 and $75,000 respectively. Before and after these judgments were rendered, and while they were on appeal to the Mississippi Supreme Court, the Martins made offers of settlement within the range of the $100,000 policy limit. Travelers, however, steadfastly rejected these offers on advice of its lawyers that, even after the *Watkins* case was decided, Kinnard was not its insured.

In the federal court action to enforce Travelers' obligation to insure Kinnard, the district judge expressed his doubts that there was a question of fact for the jury on the issue of Travelers' bad faith. Nevertheless, he submitted the question to the jury; and when the jury found Travelers guilty of bad faith, he granted Travelers' motion for judgment n. o. v. The trial court held that there was no substantial evidence of Travelers' bad faith to justify the jury's verdict. In its opinion, the trial court stated that it could not "envision much, if anything, more that the defendant Travelers could have done under the facts and circumstances of this case to show good faith toward * * * Kinnard."

On this appeal, Kinnard and the Martins argue that the question of Travelers' bad faith was properly submitted to the jury. Specifically, cross-appellants point to Travelers' refusal to accept offers of settlement within its policy limits, in disregard of Kinnard's interests in accepting such offers and with unjustifiable reliance on opinion of counsel that Kinnard was not covered by the Hubbard policy; to Travelers' dismissal of a federal declaratory judgment action, allegedly in order to shift to Kinnard and the Martins the burden of proving coverage; to the failure of Travelers' appointed counsel, Mr. Moss, to defend Kinnard in the state courts on the basis of a tire blow out; and to Travelers' failure to investigate Kinnard's prior use of the Hubbard vehicles, as a result of which the company would not properly evaluate Kinnard's coverage.

■■■ Under Mississippi law, if the allegations in tort suit pleadings are such as would, if true, bring the claim within the coverage of an insurance policy, the insured is required to defend its putative insured. Southern Farm Casualty Ins. Co. v. Logan, 238 Miss. 580, 119 So.2d 268. If the insurer believes that the tort suit defendant is not in fact its insured, the insurer may refuse to provide him with a defense. However, such a course is fraught with risk for the insurer, since if the insurer's refusal to defend is ultimately found unjustifiable, the insurer is liable for damages resulting from its failure to defend. Southern Farm Bureau Casualty Co. v. Logan, *supra;* Mavar Shrimp & Oyster Co. v. U. S. F. & G. Co., Miss., 187 So.2d 871. Ordinarily, damages will consist of the defendant insured's cost of defense. If the insured has settled the case the insurer will be liable for the amount of any settlement even if the applicable policy requires the insurer's consent to any settlement agreed to by the insured.

We conclude from this review of Mississippi law that Travelers acted under compulsion of its duty to defend Kinnard when it undertook to provide his defense under a non-waiver agreement. It is true, of course, that its decision to defend Kinnard was in no sense eleemosynary, since Travelers risked adverse financial consequences if it unjustifiably refused to defend. Yet those adverse consequences are prescribed by Mississippi law; and Travelers' decision to defend Kinnard was therefore a decision imposed upon the company. It was not a decision which may fairly be described as a ploy to prevent Kinnard from conducting his defense in his own best interest.

Thus we see no reason to examine with unusual closeness Travelers' performance of its duty to act in good faith on Kinnard's behalf simply because the company undertook Kinnard's defense when it felt he was not covered. Instead, we rely upon the principles which traditionally underlie the insurer's duty to conduct litigation and settlement negotiations properly when acting on behalf of its insured. The insurer must consider the interests of the insured, as well as its own, at every step of the way. This duty is imposed since, by assuming the burden of the insured's defense, the insurer "assume[s] exclusive control of the claim against the insured, and [takes] unto itself the power to determine for the insured all questions of liability, settlement, of defense and management before and during trial, and of appeal after final judgment." American Mut. Lib. Ins. Co. v. Cooper, 5 Cir. 1932, 61 F.2d 446.

One of the most crucial of the insurer's obligations is its duty to evaluate any settlement offers from the joint perspective of its own interests and those of its insured. Many courts have defined the degree of consideration owed by the insurer to the insured's interests as one of "good faith." J. Appleman, Insurance Law and Practice § 4711 (Supp. 1971). Mississippi, however, still adheres to a far less stringent requirement, one laid down many years ago: an insurer cannot be found liable in excess of its policy limits for failing to settle an action unless its refusal to settle was so arbitrary and unreasonable as to constitute fraud. Farmers Gin Co. v. St. Paul Mercury Indemnity Co., 186 Miss. 747, 191 So. 415 (1939). Ordinarily, application of the standard presents a question of fact, and the finder of fact must decide whether the insurer properly considered the interests of the insured in refusing an offer of settlement. For example, when the policy limit is $10,000 and the claimant, having sued for $100,000, offers to settle for $10,000, the insured would benefit handsomely by such a settlement. It would preclude a possible judgment against the insured in excess of policy limits. At the same time, the insurer would wish to reject the offer, since its defense might be successful at trial; and even if it failed at trial, the insurer would risk only the added cost of a litigated defense. See R. Keeton, Basic Text on Insurance Law § 7.8 (1971). If on these facts the insurance company refused settlement, the trier of fact would decide whether the possible gain to the insurance company was so unlikely and so insignificant relative to the magnitude and likelihood of detriment to the insured that the insurer was acting arbitrarily and unreasonably with regard to the insured's interests.

In the present case, however, we must add a new ingredient to the mixture which the jury was called upon to sample: Travelers' denial of coverage. Had this denial been groundless or disingenuous, it would not be a proper consideration in evaluating Travelers' conduct of the Kinnard litigation. But we agree with the district court that Travelers had good reason to assert that Kinnard was not its insured under the Hubbard policy. Part I of this opinion bears out Travelers' contention that a serious question of coverage remained unresolved, even if we have today finally decided the question adverse to Travelers. Given the seriousness of the coverage question, it is easy to see why Travelers would refuse *any* offer of settlement above minimal proportions. For Travelers to have accepted the Martins' offer, it would have been forced to swallow the bitter pill of assuming financial responsibility for one to whom it earnestly believed it owed no legal obligation whatever. Travelers' only recourse would have been to pay out a sum of money approaching $100,000 on Kinnard's behalf—with no hope of recovering the money should its claim that Kinnard was not its insured later be vindicated in federal court. Since Kinnard had no significant financial resources, there was no chance of employing the

technique mentioned in Milbank Mut. Ins. Co. v. Schmidt, 8 Cir. 1962, 304 F. 2d 640, where the insurer offered to settle if the insured would promise to reimburse it in the event the insurer was ultimately held not liable under the policy.

To allow a jury to consider the insurer's good faith in refusing settlement on these facts would, we think, be a giant step even in those jurisdictions which have imposed stiff obligations upon insurers to consider the interests of the insured. The Mississippi trial judge here, whose view of local law we have good reason to respect, Petersen v. Klos, 5 Cir. 1970, 433 F.2d 911, applied *Farmers Gin* and we shall follow his lead here.

We hasten to point out that an insurer is not absolved of all responsibility to a possible insured whom it has undertaken to defend merely because the company is denying coverage. No court would allow an insurer to take control of the insured's defense and exercise gross negligence in handling that defense in reliance upon a defense of no coverage. But it is one thing to impose upon the insurer the obligation to prosecute the insured's defense with reasonable diligence, and quite another thing to require the insurer to settle a claim at a cost of many thousands of dollars before the insurer has had a full opportunity to litigate a serious question of coverage. We therefore affirm the district court's entry of judgment for Travelers n. o. v. insofar as that judgment reflects the court's conclusion that no reasonable and fair minded juror could believe that Travelers' refusal to settle was "so arbitrary and unreasonable as to constitute fraud." Farmers Gin Co.; *see* Boeing Co. v. Shipman.

 B. We also agree with the district court that none of the other grounds advanced by Kinnard and the Martins were sufficient to support a jury finding of bad faith. Travelers' decision to dismiss its federal declaratory judgment action to determine coverage is not one which a federal district court, or this Court, is omniscient enough to scrutinize for improper motives. Even if we assume that Travelers sought only to shift the burden of proving coverage to Kinnard and the Martins, they have adduced no support for their position that Travelers owed to Kinnard the duty of lightening Kinnard's burden of proving coverage, a legal issue with respect to which Travelers and Kinnard were from the outset adverse parties.

We may dispose briefly of the two additional arguments which Kinnard and the Martins advance as sufficient to support a jury finding of bad faith. They argue, first, that counsel appointed by Travelers failed to raise a crucial affirmative defense on Kinnard's behalf during the state court trial of the Martins' suit for damages. Specifically, they point to Kinnard's statement to Travelers that his accident was caused by a blowout of a front tire on the Hubbard station wagon. Had this blowout been raised by way of affirmative defense, cross-appellants now argue, the outcome of the initial litigation might have been more favorable to Kinnard. But we think it far too late in the day to begin second-guessing the litigation strategy and preparation of counsel in a negligence action which proceeded to judgment several years ago. The lower court was well within its discretion in refusing to allow receipt of speculative testimony about the consequences of Travelers' appointed counsel's failure to raise the blowout issue in state court.

The second prong of Kinnard's attack on Travelers' conduct of his defense centers on the insurer's alleged bad faith in failing to investigate properly evidence of Kinnard's unauthorized use of the Hubbard vehicle prior to the time of the accident. Apparently, Kinnard's position is that the company intentionally closed its eyes to evidence which would undercut its reliance on Kinnard's lack of coverage during any ensuing settlement negotiations. We find, though strong evidence that counsel for Travelers had interviewed a number of residents of

Hickstown, and that none disclosed any prior use of Hubbard vehicles by Kinnard for his own purposes. We cannot now find fault with Travelers' investigation simply because hindsight suggests that a different process of investigation might have revealed information more favorable to Kinnard's position on coverage. There is no evidence in the record that Travelers conducted its investigation with blinders on so as to shield itself from information that might undermine its belief in the strength of its no coverage defense.

### III. *Other Errors Alleged.*

Travelers also asserts that, even if the issue of Kinnard's coverage was properly submitted to the jury, other errors so infected the proceedings below as to require us to remand for a new trial.

A. Travelers contends that the lower court should have allowed the jury to decide whether Kinnard had violated the duty of cooperation which he, as an omnibus insured owed to his insurer. Ordinarily, to demonstrate a breach of the insured's duty of cooperation, the insurer must show that the insured made false statements or conducted himself in some other fashion materially prejudicing the insurer's ability to defend the lawsuit on the insured's behalf. Here, even if we assume that Kinnard falsely denied any previous deviations from his employer's instructions, no prejudice to the insurer's defense of Kinnard resulted from this misstatement. Kinnard's previous visits to Hickstown, if any there were, had no bearing on his liability to the Martins, but only upon the issue of his coverage under the Hubbard policy.

Cooperation clauses are intended to guarantee to insurers the right to prepare adequately their defenses on questions of substantive liability. We know of no case in which the insured's duty of assistance and cooperation has been used to force a putative insured to divulge to the insurer every jot and tittle of information which may aid the in-surer in defeating his claim for coverage, but which in no way hinders the insurer's ability to provide the insured with a proper defense. We certainly cannot say that the district court committed fatal error when it declined to allow this novel legal position to pass to the jury for factual resolution.

B. Travelers also questions the lower court's decision to allow the Martins, as judgment creditors, to raise the issue of Travelers' bad faith. Pointing to our decision in Seguros Tepeyac, S.A., Compania Mexicana de Seguros Generales v. Bostrom, 5 Cir. 1965, 347 F.2d 168, rehearing denied 360 F.2d 154, and to a recent decision by the district court for the Northern District of Mississippi, Nichols v. U. S. F. & G. Co. (N.D.Miss. 1970), 318 F.Supp. 334, Travelers contends that the duty of good faith settlement runs only from insurer to insured, and not to judgment creditors of the insured. Apparently, Travelers' position is that the judgment creditor should not have been allowed to adduce evidence of Travelers' bad faith since this evidence colored the jury's interpretation of the evidence on the issue of coverage. If we should decide to uphold presentation of the bad faith issue by the Martins, Travelers argues that the Martins' right to present this issue rendered the intervention by Kinnard extraneous in violation of Fed.R.Civ.P. 24. It is Travelers' contention that the Kinnard intervention was so prejudicial to Travelers' position that we should remand the case for a new trial below.

Without deciding whether the duty of good faith could be enforced directly by a judgment creditor, we have decided that there is no reason to remand for a new trial based on Travelers' contentions of prejudice. The starting point in our analysis is to determine whether Kinnard's intervention would have been proper on the sole issue of his coverage under the Travelers policy, there being no doubt about the propriety of the Martins' suit to enforce their judgment within the applicable policy limits. Fed.R.Civ.P. 24 requires us

to consider three factors in assessing Kinnard's intervention: 1) whether Kinnard could claim an interest relating to the transaction which was the subject of the Martins' action; 2) whether the disposition of the Martins' action might as a practical matter have impaired or impeded Kinnard's ability to protect his interest; 3) whether Kinnard's interest was adequately represented by existing parties at the time of his intervention —namely, the Martins.

Turning to the first factor, we think Kinnard's interest in intervening was apparent. He sought to do his part to avoid being saddled with a judgment which in all likelihood, he could never satisfy during the remainder of his lifetime. Consideration of the second factor in Rule 24 is more complicated. We must consider the alternative to allowing Kinnard's intervention on the issue of coverage: a second action by Kinnard against Travelers brought after the possible unfavorable outcome of the Martins' attempt to demonstrate Kinnard's coverage. We do not doubt that the disposition of the coverage issue in a hypothetical first lawsuit by the Martins alone would have substantial practical impact on Kinnard's efforts to prove coverage in a possible second suit of his own. Res judicata would not apply to bar Kinnard's suit. But stare decisis, which dictates respect for prior judicial determinations of identical points of law, would loom large in any attempt by Kinnard to achieve a favorable resolution of the coverage issue on his own after the Martins had struck out.

As for the third factor, we cannot say that Kinnard's interest was adequately represented by the Martins in their effort to determine coverage. Kinnard was the central figure in this drama. He may well have felt that information within his control required him to assume a position of participation in this litigation which, after all, was to determine whether Kinnard's weekly paycheck was to be shrunk by one-fourth for the rest of his life. In short, Kinnard could not be relegated to the sidelines on the issue of coverage, an issue which the parties agree is the central issue in this case.

This brings us to the question of Kinnard's intervention on the issue of Travelers' good or bad faith in foregoing a number of settlement offers tendered it by the Martins. We shall assume, without necessarily so deciding, that the Martins could not properly raise the issue in an action alone by the Martins against Travelers. The question reduces then to whether Kinnard having been permitted to intervene on the issue of coverage alone could properly raise the bad faith issue at the same trial. We think that the answer to this question is clear. It would make little sense to require a separate jury trial on the issue of bad faith settlement. The issue was intimately connected with the question of coverage under the Travelers policy since the nucleus of the bad faith claim was the spirit of Travelers' reliance upon its defense of no coverage. Travelers' good faith could not really be determined unless the finder of fact could weigh the honesty of Travelers' reliance on its no coverage defense. A second, independent trial to determine Travelers' good faith would have required in substantial part a reprise of the trial of the coverage issue at the first trial. The considerations of judicial efficiency which underlie Rule 19 must also inspire our interpretations of Rule 24. Atlantis Development Corp. v. United States, 5 Cir. 1967, 379 F.2d 818. Our task is not to require an elaborate legal minuet in the courts below, but to support the efforts of those courts to insure that litigation moves sensibly and purposefully forward.

▊ We think, then, that Kinnard's intervention on the issue of coverage was proper, and that Kinnard had the right to raise the bad faith issue as well once he had intervened. We cannot order a new trial because at the actual trial the Martins, and not Kinnard alone, were allowed to introduce evidence in support of the assertion that Travelers was guilty of bad faith. We see no indication that any prejudice resulting from

this procedure was substantial enough to justify the grant of a new trial. Rule 61 of the Federal Rules of Civil Procedure commands the lower federal courts to disregard any error or defect in a proceeding which does not affect the substantial rights of the parties. And it has long been settled that this Court, too, must measure any supposed dereliction in the same light of substantial justice. Clegg v. Hardware Mut. Cas. Co., 5 Cir. 1959, 264 F.2d 152. We are convinced that no substantial prejudice was done to the defendants' case merely because counsel for the Martins was allowed to introduce evidence of Travelers' bad faith during the same trial in which that issue had been raised by Kinnard's counsel during his presentation of the Intervenor's case. Several times during his lengthy charge to the jury, the trial judge reminded the jury to distinguish the coverage issue from the bad faith issue.[4] Whatever minimal prejudice may have arisen from the Martins' presentation of evidence on the question of bad faith was cured by these instructions. In sum, the lower court's handling of the Kinnard intervention and of the presentation of evidence by the respective parties plaintiff affords no basis for reversal or new trial.

■■■■ C. Travelers also complains of the admission into evidence of the decision and record in the Watkins case, which we have already discussed in connection with the issue of Travelers' bad faith. Travelers does not deny that the *Watkins* evidence was *relevant* to the jury's disposition of the bad faith issue. Rather, the company apparently contends that the evidence was gravely prejudicial because the jury was allowed to consider judicial pronouncements and legal documentation on a matter similar to the present case. Arguably, the admission of these materials may have confused the jury into believing that its task was to apply the law of *Watkins* to the facts of the present case.

We do not, however, see sufficient danger of prejudice to warrant reversal on the facts of this case. Relevant evidence is to be excluded when, in the discretion of the trial judge, its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. See Proposed Rules of Evidence for the United States Courts, Revised Draft, Rule 403. Assertions of evidentiary prejudice "call for balancing the probative value of and need for the evidence against the harm likely to result from its admission." Advisory Committee's Note to Proposed Rule 403.

The trial judge observes first hand the proceedings below. His determinations must be given great weight when we who are removed from the actual trial review his conduct of this balancing process. In this case, it was essential to place before the jury some means of considering Travelers' refusal to settle in light of the decision of the Mississippi Supreme Court in the *Watkins* case. The trial judge, weighing probative value and prejudice, elected to admit the *Watkins* decision and record into evidence. We cannot say that the lower court's evaluation of the relative pros and cons of the evidence was manifestly wrong. We particularly note the thorough and clear instruction of the court that the jury consider the *Watkins* material only on the issue of bad faith. Moreover, the court instructed the jury not to consider *Watkins* determinative of even the issue of bad faith; it was rather to view the case only as an indication of Travelers' grounds for refusing

4. See, for example, the trial court's charge: "You are instructed that even if you should find from a preponderance of the evidence in this case that on the occasion in question that Charles Kinnard was an insured of the Defendant and covered by the policy issued by the Defendant to Hubbard Butane and Charles Hubbard, *still the Defendant Travelers may not be held liable* for any amount in excess of its policy limits *unless you further find from a preponderance of the evidence* that Defendant Company acted in bad faith in failing to settle the Martins' claims within its policy limits" (emphasis supplied.)

to settle with the judgment creditors. There was no reversible error in admitting the *Watkins* materials.

█ D. We have also considered Travelers' objections to the admission of a state motor vehicle safety report in which the company acknowledged that a policy was in effect on the vehicle driven by Kinnard. We assume for purposes of argument that the trial judge went beyond his discretion in admitting the report as a relevant piece of evidence. Any assumed error, however, was not of sufficient magnitude to justify reversal or a new trial. As Chief Judge Brown has stated for this Court, the task of review is

> not the simple one of identifying the * * * incidents and then under microscopic examination ascertain whether in one way or another the rulings lack perfection. Under command of F.R.Civ.P. 61 and 28 U.S.C.A. § 2111, ours is a more substantial function which epitomizes the very nature of adjudication. We must determine whether, assuming the action under review to have been erroneous, was it really harmful to the complaining party?

Tugwell v. A. F. Klaveness & Co., 5 Cir. 1963, 320 F.2d 866 (citations omitted).

█ E. In a last ditch effort to obtain a new trial, Travelers' final series of objections focuses upon the closing argument of the Martins' attorney, Mr. Bowling. First, Travelers asserts that opposing counsel falsely attributed to Hubbard an "admission" that "he had suspicions" that Kinnard had previously violated company instructions in using Hubbard vehicles at night for social purposes. We do not agree, as Travelers suggests, that this characterization of Hubbard's testimony amounted to a substantial misstatement of the evidence. Although Hubbard initially denied having any "suspicions" of Kinnard's extracurricular use of borrowed vehicles, a few moments later Hubbard provided sufficient basis for Mr. Bowling's argu-

ment to the jury. When asked why he continued to instruct Kinnard as to the scope of his permission to use the Hubbard vehicles, if Hubbard did not suspect Kinnard of violating the initial limitations, Hubbard replied: "I don't know whether you'd call it a suspicion or not. I guess I wanted to refresh them once in a while about it." Since argument to the jury is just that, counsel Bowling's attribution of suspicion to Hubbard was a fair characterization of the testimony, although it was an interpretation favorable to the Martins' side of the case. Argument to the jury is argument, not impartial recapitulation. And Mr. Bowling's characterization of Hubbard's response was not an unfair distortion requiring us to provide a new trial.

█ F. Travelers also urges us to remand for a new trial because counsel for the Martins used the *Watkins* case as a taking off point to argue law to the jury. We note, however, that immediately following the argument now objected to the trial judge warned the jury:

> Ladies and Gentlemen of the Jury, if this matter was referred to in the testimony, I will let you proceed, but I just want to tell you Ladies and Gentlemen of the Jury once again that all of the law that you receive to apply to the facts of this case will come from the Court after counsel conclude their argument.

This reminder, and the thorough instructions on *Watkins* which followed, were more than ample to guard against possible jury misuse of counsel's references to the *Watkins* case.

█ G. Finally, we see no merit to Travelers' contention that counsel for the Martins misrepresented the contents of the first special interrogatory submitted to the jury. The only misrepresentation we perceive resulted from an innocent slip of the tongue. To recommence this long struggle on such slim

provocation would not be consonant with our responsibility to do substantial justice.

The original trial of this difficult case was proper and fair. For the reasons stated, the judgment of the district court must therefore be affirmed.